The Honorable Robert S. Lasnik

```
_____ FILED    _____ ENTERED
_____ LODGED _____ RECEIVED

DEC 02 2010

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY
```

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

LIAN YANG,

                Defendant.

CASE NO. MJ10 - 498

COMPLAINT for VIOLATION of
Title 18, United States Code,
Section 371

BEFORE, ROBERT S. LASNIK, Chief United States District Judge,
United States Courthouse, 700 Stewart Street, Seattle, Washington

The undersigned complainant, Joseph Hooper, being duly sworn states:

## COUNT 1

### (Conspiracy to Violate the Arms Export Control Act)

      Beginning at a time unknown, and continuing until on or about December 3, 2010, at Seattle, within the Western District of Washington, and elsewhere, LIAN YANG, and other persons known and unknown, knowingly and intentionally did conspire to willfully export defense articles designated on the United States Munitions List ("USML"), International Traffic in Arms Regulations ("ITAR"), from the United States to the People's Republic of China, without having obtained from the United States Department of State the export licenses required for these defense articles, in violation of the Arms Export Control Act, Title 22, United States Code, Section 2778, and Title 22, Code of Federal Regulations, Section 127.1.

*United States v. Lian Yang*
COMPLAINT - Page 1

**A.    Background**

At all times relevant to this Complaint:

1.    LIAN YANG is an individual who resided in Woodinville, Washington.

2.    Xilinx, Inc. is a corporation that manufactures a product described as QPro Virtex-II 1.5V Radiation-Hardened QMP Platform FPGA, P/N: XQR2V3000-4CG717V (the "Subject Parts"). The Subject Parts are radiation-hardened, programmable semiconductor devices that are used in satellites. The Subject Parts are covered by Category XV(e) of the United States Munitions List, and thus cannot be legally exported from the United States without a license issued by the U.S. Department of State.

**B.    Manner and Means of the Conspiracy**

3.    It was part of the conspiracy that LIAN YANG and his coconspirators attempted to export 300 units of the Subject Parts, from the United States to the People's Republic of China, without an export license or approval from the U.S. State Department authorizing the export of these items, as required by law.

4.    It was further part of the conspiracy that LIAN YANG negotiated with two undercover agents to purchase 300 units of the Subject Parts. As part of the transaction, it was LIAN YANG's intent that a United States based company would purchase the parts from Xilinx, obscuring the fact that the parts were intended for a Chinese end user.

5.    It was further part of the conspiracy that LIAN YANG intended for the purchase order paperwork to falsely reflect that non-export restricted parts were being purchased.

6.    It was further part of the conspiracy that LIAN YANG and his coconspirators wire transferred $60,000 to an undercover bank account in partial payment for five of the Subject Parts.

7.    It was further part of the conspiracy that LIAN YANG and his coconspirators agreed to pay an additional $20,000 in cash upon delivery of the five Subject Parts.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

8.    It was further part of the conspiracy that LIAN YANG negotiated a payment schedule with the undercover agents for the purchase and delivery of the remaining 300 Subject Parts in exchange for payments totaling $620,000.

9.    It was further part of the conspiracy that LIAN YANG obtained funding from others known and unknown to complete the purchase of the Subject Parts.

10.    It was further part of the conspiracy that LIAN YANG was attempting to acquire the Subject Parts on behalf of a buyer in China.

C.    **Overt Acts in Furtherance of the Conspiracy**

11.    During and in furtherance of the conspiracy, within the Western District of Washington and elsewhere, one or more of the conspirators committed one or more of the following overt acts, among others:

a.    On September 14, 2010, LIAN YANG met at a Seattle, Washington restaurant with two undercover agents and another individual to solicit the help of the undercover agents in purchasing 300 units of the Subject Parts.

b.    On October 1, 2010, LIAN YANG met with the same two undercover agents at a restaurant in San Francisco, California to negotiate the price of the Subject Parts and to discuss the logistics of the transaction.

c.    On or about October 6, 2010, LIAN YANG and his coconspirators wire transferred $60,000 to an undercover bank account in partial payment for five of the Subject Parts.

All in violation of Title 18, United States Code, Section 371.

//
//
//
//
//
//
//

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    And the complainant states that this Complaint is based on the following

2  information:

## I. BACKGROUND

4    12.    I have been employed as a Special Agent with the Federal Bureau of

5  Investigation ("FBI") since July 2008.   I am currently assigned to a counter-intelligence

6  squad at the Seattle Division.  I have experience investigating counter-intelligence

7  violations, including violations of Title 22, United States Code, Section 2778.

8    13.    The facts in this affidavit come from my personal observations, my training

9  and experience, and information obtained from other agents, analysts, and witnesses.

10  This affidavit is intended to show merely that there is sufficient probable cause that LIAN

11  YANG committed the offense alleged above and does not set forth all of my knowledge

12  about this matter.

## II. SUMMARY OF THE INVESTIGATION

14  **A.    The Initial Meeting Between YANG and the Confidential Source.**

15    14.    On March 9, 2010, a confidential source ("CS") met with YANG.  The CS

16  is a person who is familiar with the international trade industry.  A mutual friend had

17  arranged for YANG to meet with the CS.  According to the CS, during the meeting

18  YANG stated that he had "old school friends" in China who have made money importing

19  electronic components from the United States.  YANG further stated that certain

20  component manufacturers were reluctant to sell outside of their normal distribution

21  channels, and that these circumstances presented an opportunity for YANG and the CS to

22  make money.  YANG stated that some of the items that his associates in China sought to

23  acquire might be export restricted.  The CS reported that YANG said he was "not a spy,"

24  that he would stay away from the restricted items, and that he did not want to do anything

25  illegal.  YANG provided the CS with a list of seven electronic items that he wished to

26  acquire, including 100 units of part number XQR2V3000-4CG717V, which is

27  manufactured by Xilinx, Inc. (the "Subject Parts").  My review of the specifications for

28  these parts reveals that they are radiation-hardened, programmable semiconductor devices

*United States v. Lian Yang*
COMPLAINT - Page 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  that are used in satellites.[1]

2      15.    The CS first reported the above information to the FBI on March 11, 2010.

3  On March 16, 2010, the CS met with myself and another FBI Special Agent to discuss

4  this matter.  Thereafter, the actions taken by the CS with respect to this investigation were

5  directed by myself and/or other FBI agents.  To the best of my knowledge, prior to this

6  time the CS was not working as an informant with any law enforcement agency.  The

7  information that the CS has provided to date has proven to be reliable.[2]

8  **B.    The CS's Initial Efforts to Acquire the Technology as Tasked by YANG.**

9      16.    On March 18, 2010, the CS contacted Data Device Corporation ("DDC")

10  about one of the electronic parts (not the Subject Parts) that YANG wanted to acquire.[3]

11  DDC requested that the CS identify the end user of the parts and their intended use.  The

12  CS sent YANG an email asking for this information.  On March 19, 2010, YANG

13  responded that his "partner" informed him that the parts were intended for China Space

14  Technology Company's "next-gen" spaceship program.  YANG advised the CS that his

15  partner would obtain an end user certificate.

16      17.    On March 25, 2010, YANG called the CS over the telephone and inquired

17  about one of the other electronic parts he was attempting to acquire, which was

18  manufactured by Peregrine.[4]  YANG said that his friends in China were pushing him to

19  acquire 100 of the Peregrine parts.  YANG explained that he had previously purchased

20  this part through another channel, but that half of the parts were defective.  He further

21

22      [1] As described more fully below in Section S, the United States Department of

23  State, Directorate of Defense Trade Controls ("DDTC"), has advised me that the Subject
    Parts are covered by Category XV(e) of the United States Munitions List, and thus cannot

24  be legally exported from the United States without a license.

25      [2] The CS has no known criminal history.  To date, the FBI has paid approximately
    $2,000 to the CS, primarily as reimbursement for expenses associated with this

26  investigation.

27      [3] As described more fully below in Section S, DDTC has provided a preliminary
    Level 1 determination that the parts manufactured by DDC are ITAR controlled.

28      [4] As described more fully below in Section S, DDTC has provided a preliminary
    Level 1 determination that the parts manufactured by Peregrine are ITAR controlled.

*United States v. Lian Yang*
COMPLAINT - Page 5

1 | stated that Peregrine should have an end user certificate on file from the past order. On
2 | March 29, 2010, YANG wrote to the CS, and asked if the CS had heard from Peregrine
3 | about the requested parts. The CS responded to YANG, stating that a new end user
4 | certificate was needed. On March 30, 2010, YANG told the CS that, "I have info they
5 | need."

6 |        18.     On March 31, 2010, the CS wrote to YANG, explaining that Peregrine had
7 | informed the CS that the requested part was on the ITAR list, and thus that a detailed end-
8 | user certificate needed to be submitted. The CS told YANG that, for the same reasons, an
9 | end user certificate also would be required for the parts requested from DDC.

10 |        19.     On March 31, 2010, YANG provided (via email) a document to the CS
11 | entitled, "End Use Certificate." The certificate disclosed a Hong Kong company as the
12 | intended end user of the requested parts. The certificate stated that the parts were to be
13 | used in connection with "China's new generation of passenger jet." In his email to the
14 | CS, YANG stated that all of the parts he initially requested to acquire were for the same
15 | "client and end user."

16 | **C.     The April 1st Meeting Between YANG and the CS.**

17 |        20.     On April 1, 2010, the CS met with YANG at a restaurant in Bellevue,
18 | Washington. This meeting was not recorded by the CS, due to operational concerns.
19 | According to the CS, during the meeting YANG reiterated his desire to purchase the parts
20 | manufactured by DDC and Peregrine. YANG explained that the profits from the
21 | transactions would be split three ways – between YANG, the CS, and YANG's business
22 | partner in Hong Kong.

23 |        21.     On April 3, 2010, the CS forwarded YANG's "End Use Certificate" to both
24 | DDC and Peregrine. The CS advised YANG that he sent the "End Use Certificate" to
25 | both companies, and YANG replied via email, "I am keeping my fingers crossed!"

26 |        22.     On April 13, 2010, DDC informed the CS that the requested part was
27 | controlled for export under the ITAR regulations, and thus the company could not sell the
28 | part for an end user based in China. The CS relayed the message from DDC to YANG

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  via email, stating that DDC would not provide "any ITAR controlled device to be sold for

2  export through third parties." Similarly, Peregrine also informed the CS that they could

3  not sell him the parts due to the ITAR regulations. The CS also passed this information

4  on to YANG.

5  **D.    YANG Proposes Forming a Company to Acquire the Export Controlled Parts.**

6       23.    On April 20, 2010, YANG sent an email to the CS proposing: "Maybe we

7  should form a company?" On April 29, 2010, YANG sent the CS another email, stating

8  that he was "in China right now," and further explaining his idea regarding forming a

9  company: "We can form a company and buy [DDC's product], which they [his overseas

10  clients] want so badly."

11       24.    On April 29, 2010, the CS responded to YANG with a list of questions

12  regarding YANG's intentions for the company, including, "Do you have some ideas on

13  how we can ship the parts after we have acquired them from the manufacturers? Will

14  your partner be willing to cover the extra shipping costs to the final destination? . . . How

15  quickly do they need the parts?" On April 30, 2010, YANG responded to the specific

16  questions listed above by writing, "That is the hardest question [the shipping]. I will

17  probably need to discuss it with you face to face. . . . They need it yesterday."

18  **E.    The May 4th Meeting Between YANG and the CS.**

19       25.    On May 4, 2010, YANG met with the CS at a restaurant in Bellevue,

20  Washington. The meeting was consensually recorded by the CS. During the meeting,

21  YANG further discussed the subject of setting up a company to acquire the parts he was

22  seeking. YANG also explained that the company could be (falsely) listed as the end user

23  for the products, despite the fact that he had previously acknowledged the end user was

24  actually in Hong Kong and/or China. Based on my training and experience, and on the

25  discussion between YANG and the CS, I believe that YANG's purpose in forming a

26  company was to add the appearance of legitimacy to the contemplated illegal transaction.

27  Regarding the use of the front company, YANG said, "[G]ive it a try and say we need it

28  [the parts] for R and D. But if they do more investigation [into the company] or

*United States v. Lian Yang*
COMPLAINT - Page 7

1  something, then they [the parts distributors] say no, then there's no other way, I guess."

2  YANG stated that the CS would have to be listed as the contact person for the company,

3  "since you have a better [non-Chinese] last name. . . . And I will be the secret (laughing)

4  shareholder." The CS suggested that the company should be formed in Nevada, because

5  Nevada has favorable corporate secrecy laws. YANG concurred with this plan.

6      26.     YANG explained that his foreign buyers would pick-up the products

7  themselves after they were acquired. Specifically, YANG stated, "So, if you get it [the

8  parts], I think it's just, it's easy to ship it out. . . . And then it's their responsibility to take

9  it out." The CS commented that it should not be so difficult to obtain parts that were

10  simply going to be used in a commercial airline project, as was indicated on the "End Use

11  Certificate" YANG produced. YANG responded by suggesting that he was suspicious

12  that the parts may actually be intended for a different use: "That's what they say

13  [commercial airline project]. I don't know where it goes exactly. Maybe (laughing) . . . I

14  know something totally different. . . . [A]t the end, it's used in a commercial airline.

15  That's what they say, anyway."

16      27.     The CS expressed some concern to YANG over the paper trail that would

17  be left from a transaction in which their company was listed as the end user of the parts,

18  but where the parts would actually end up in China or Hong Kong. The CS stated, "I'm

19  just thinking ahead a little bit . . . 'cause there's always a paper trail, you know?" YANG

20  acknowledged the risk involved in the transaction they were contemplating: "Yeah, I

21  mean if they [the U.S. Government], if they check then, there's uh, I mean, unless you say

22  the product is disappeared or exploded or something then they . . . can always find,

23  (laughs). Yeah so that's the, yeah, there, there is some risk in it. It's just, uh, hopefully

24  have minimize the risk by . . . by prepare ourselves for those (unintelligible)."

25      28.     Later in the conversation, YANG discussed his concerns over the "money

26  trail" and the possibility of raising "red flags" by ordering too many parts at one time.

27  Specifically, YANG stated, "So the money trail is a problem. It, it would be from Hong

28  Kong. We can say . . ." The CS suggested that the payment from Hong Kong could be

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  described as an "investment" rather than a payment for the parts.  YANG replied, "Yeah,

2  I mean, for R and D there's really no problem. . . .  Yeah, it's just the (unintelligible) if

3  they buy a lot [of parts]. . . .  And that could raise the flag."

4      29.    On May 12, 2010, the CS emailed YANG a State of Nevada business

5  incorporation form.  The CS asked YANG to fill out the paperwork and return it to the

6  CS.  The CS sent a follow-up email to YANG on June 21, 2010, after not hearing back

7  from YANG.  In the email, the CS asked what YANG's plans were regarding going

8  forward with the transaction.

9  **F.    The July 9th Meeting Between YANG and the CS.**

10      30.    On July 9, 2010, the CS and YANG met at a restaurant in Redmond,

11  Washington.  The meeting was consensually recorded by the CS.  The CS and YANG

12  again discussed forming a company to purchase the parts YANG was seeking.  YANG

13  confirmed that "China" would be financing the purchases.  YANG also discussed the way

14  the parts would be shipped overseas, stating that someone would pick-up the parts in the

15  United States and then export them out of the country.  The CS asked YANG, "And you

16  will take care of shipping it out and everything, or what?"  To which YANG replied,

17  "Yeah."  YANG also mentioned the possibility that the parts would be tested in the

18  United States before they left the country.

19      31.    YANG reiterated that he was seeking to acquire the parts manufactured by

20  DDC and Peregrine, along with the other parts on his original list.  YANG also

21  specifically requested that the CS attempt to acquire the Subject Parts manufactured by

22  Xilinx.  YANG told the CS that he had a supplier in Russia who could obtain some of the

23  parts, and that obtaining parts from Russia would be "really no danger for any of us."

24  However, YANG explained that parts from Russia often have quality concern issues, and

25  delivery from Russia was "a little bit complicated."  Thus, YANG preferred to acquire the

26  parts directly from the United States.

27  //

28  //

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**G.    Initial Discussions About the CS's "Contact" in the Industry.**

32.    After the above referenced meeting, and at the direction of FBI agents, the CS told YANG that he had a "contact" who might be able to obtain the parts for YANG.[5] The CS told YANG that he would ask his contact to focus on acquiring the parts from DDC and Peregrine, as well as the Xilinx Subject Parts, given that YANG had indicated a particular desire for these parts.

33.    During a series of email correspondence in late July, YANG inquired about the status of the CS's acquisition of the above referenced parts. For example, on July 18, 2010, YANG asked, "How is the progress with your associate[s]? My associates would like to know if we are able to acquire the products no later than Monday. If you cannot, that is fine." On July 25, 2010, YANG wrote, "How is going? Any progress? Please keep me posted and let me know if it's possible. [T]ime is key!"

34.    On July 26, 2010, the CS wrote to YANG explaining that his "contact" was working on the matter, "but since most of these are ITAR restricted items, it will take him a little time to organize it properly, but will work on it right away." The CS also requested from YANG a more complete list of the items he and his associates wanted to acquire. On July 26, 2010, YANG replied via email: "I will see you next Tuesday to give you the list. Email is not proper."

**H.    YANG's Detention by CBP Inspectors on July 31, 2010.**

35.    Based on my review of travel records, I am aware that YANG traveled from Seattle to the People's Republic of China on July 22, 2010. YANG returned to Seattle on July 31, 2010. When YANG returned to the United States, he submitted a customs declaration form indicating that he had traveled to Shanghai, China for "business" and that he had no commercial merchandise in his possession. YANG was given a secondary inspection by Customs and Border Protection ("CBP") officers, during which he was temporarily detained and interviewed.

---

[5] The investigative plan was to introduce YANG to undercover FBI agents, who would pose as the CS's "contacts."

*United States v. Lian Yang*
COMPLAINT - Page 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    36.    At the outset of the interview, YANG told the CBP officers that he was a

2  contractor with the Microsoft Corporation, and that he traveled to China to meet with a

3  business associate for the purpose of discussing recruitment and training for Microsoft.

4  Thereafter, CBP officers found a list of electronics parts in YANG's computer carrying

5  case. At that point, YANG stated that the corresponding parts were located in the center

6  pocket of his computer case. The CBP officers removed a padded sleeve wrapped in duct

7  tape from the computer case. Inside the sleeve were ten Kopin LCD display units.[6]

8  YANG then admitted that, in fact, he had traveled to China for the purpose of delivering

9  the Kopin units to a business associate. When asked whether he had declared the items

10  on his departing customs paperwork, YANG admitted that he had not. The CBP officers

11  then asked YANG why he had not told them the real purpose for his travel at the

12  beginning of the interview, and YANG replied, "I don't know.  I lied."

13    37.    YANG further informed the CBP officers that he purchased the Kopin units

14  directly from the manufacturer for approximately $60,000, and that he sold them to his

15  business associate in China for approximately $70,000. YANG explained that he brought

16  the parts to China so that his business associate could "test" them, but that the results

17  were poor and he brought the defective parts back to the United States for the purpose of

18  acquiring replacement parts from Kopin. YANG further stated that he left an unspecified

19  quantity of non-defective Kopin units with his associate in China. YANG insisted that

20  the business transaction was "legal," although he claimed not to know how his business

21  partner intended to use the parts.[7]

22    38.    After YANG was interviewed by the CBP officers, he was re-interviewed

23  by Immigration and Customs Enforcement Special Agent John Arruda ("S/A Arruda").

24

25    [6] After further investigation, it was determined that these Kopin parts were not
26  controlled with respect to export to China.

27    [7] During the secondary inspection, CBP officers also found numerous documents
   relating to electronics parts in YANG's computer case. Among other documents, YANG
   possessed a product manual for the Xilinx QPro Virtex-II 1.5V Radiation-Hardened QML
28  Platform FPGA.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  At the outset of this interview, S/A Arruda presented YANG with a Statement of Rights

2  form, advised YANG of his *Miranda* rights, and asked whether YANG was willing to

3  waive his rights and speak with him.  YANG signed a waiver of rights form, and agreed

4  to speak with S/A Arruda.  YANG reiterated much of the same information he provided

5  to the CBP officers.  In addition, YANG clarified that he had originally purchased twenty

6  of the Kopin units, and that he left ten of the non-defective units with his business

7  associate in China.  YANG also stated that his business associate operates an

8  "import/export" company in China.

9        39.     YANG reiterated to S/A Arruda that he believed it was legal for him to

10 export the Kopin units.  YANG claimed not to be knowledgeable about United States

11 export regulations, but stated that he had received assurances from a Kopin employee that

12 it was legal for him to export the units to China.  S/A Arruda advised YANG that it was

13 solely the exporter's responsibility to comply with all export control laws, and that it was

14 not sufficient to rely on representations provided by the manufacturer of a product.  S/A

15 Arruda then advised YANG about the Arms Export Control Act and other major export

16 laws, including the fact that the U.S. Department of State and the U.S. Department of

17 Commerce regulate the export of various products.  S/A Arruda advised YANG that, for

18 regulated products, it is necessary for an exporter to obtain a license from one of those

19 departments prior to being able to export the item lawfully.  S/A Arruda further advised

20 YANG that only the Department of State or the Department of Commerce could

21 definitively inform him as to whether a particular product fell within these licensing

22 requirements.  S/A Arruda also told YANG that, in addition to the licensing requirements,

23 there was an additional obligation on an exporter to declare any items for export to the

24 CBP, even if those items were being hand-carried out of the United States.

25 I.     **The August 3rd Meeting Between YANG and the CS.**

26       40.     On August 3, 2010, the CS and YANG met at a restaurant in Bellevue,

27 Washington.  The meeting was consensually recorded by the CS.  YANG informed the

28 CS that he had recently been detained by the CBP, and he expressed concern over the

*United States v. Lian Yang*
COMPLAINT - Page 12

1  possible law enforcement detection of their illegal transaction. YANG told the CS, "So

2  it's really nothing, but just be careful, man. . . . Let's wait for a while." YANG further

3  stated, "I'm just um, very cautious because they took my laptop. . . . Yeah, I deleted all

4  my emails, (unintelligible) emails are totally retrievable. They find your [the CS's] name

5  in there." YANG explained, "That's why I am a little cautious for now."

6      41.    YANG and the CS then discussed how to move forward with the

7  transaction. In discussing the paperwork surrounding the potential deal, YANG said, "I

8  think the best way is it doesn't show us at all." YANG later added, "[I]f you want to

9  show anything, I don't know. If there's any other, like a Hong Kong company or

10  something. . . . I mean, I didn't know how, how dangerous this is. I mean, when I was in

11  Customs control, the guards, they just treated me as a criminal."

12      42.    YANG also advised the CS to be careful in communicating by email,

13  stating: "You can send me email but don't say anything. Just say when you want to meet.

14  So, now, I mean, let's be, be extra cautious." Toward the end of the meeting, YANG

15  further commented, "I was going to cancel [this] meeting, but then when I think, you

16  know, I still need to get on my normal life. . . . Otherwise it would, would appear to them

17  that I really have something. . . . You know, if I stop everything."

18      43.    The next day, on August 4, 2010, the CS sent YANG the following email

19  regarding YANG's concerns over proceeding "cautiously." The CS wrote:

20      [F]rankly, I am rather spooked about the whole situation. . . . In that regard,
       I am not only very concerned about your situation and hope that you will get
21      it resolved quickly, but I am as equally concerned about my own situation –
       especially since they took your laptop and iPhone, which has my contact
22      info, and especially some of our past email exchanges. As such, I went
       ahead and deleted all of our past email exchanges to date just to be safe. As
23      you've mentioned yesterday, I agree – we must be very careful on how we
       proceed from now on. . . .
24

25      44.    Later on August 4, 2010, YANG placed a telephone call to the CS. YANG

26  assured the CS that his customs situation would be resolved favorably. He further stated

27  that the customs agents would not "have anything," because he was able to delete

28  everything from his laptop computer that was seized. YANG also reiterated that he and

    the CS needed to be more careful in their dealings. YANG instructed the CS that he

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    wanted to conduct all business over the telephone and in face-to-face meetings, and that

2    they should only use email communications to confirm the dates and times for meetings.

3    **J.    YANG's Continued Efforts to Acquire the Xilinx Parts.**

4          45.    On August 13, 2010, YANG wrote the CS, stating: "[M]y partner cannot

5    wait for too long before he drops the entire project and seeks for other products." YANG

6    requested a price list in a specific format, writing "Xi $ _____ /unit." (In this context, I

7    believe that "Xi" is an abbreviation for Xilinx, the manufacturer of the Subject Parts).

8    YANG also included abbreviations for DDC and Peregrine, followed by "$_____/unit."[8]

9          46.    On August 15, 2010, the CS responded to YANG's above email, as follows:

10       As you already know, I've tried the normal route by approaching the
         companies directly, but that pretty much got us nowhere as most of these
11       are ITAR restricted items. But, through this latest contact of mine, I am
         certain that he will be able to arrange for us to obtain and buy the parts in
12       large quantities and on a regular basis, and have the items delivered for us
         here. What we do with them will be up to us. This is very much as what
13       you've said you would prefer, save for I'm still working out with him how
         we might be able to minimize the need for a lot of documentation as that
14       could be problematic for you and your partner.

15       Now, all this takes time in order to set things up properly, lest we could get
         into a lot of trouble as you and I know very well that this is very risky
16       business. You of all people should understand the degree of risks involved,
         since you have had first hand experience in terms of you recent run-in with
17       the USC [U.S. Customs]. Like you said in our lunch meeting, we need to
         be very careful going forward – I'd like to add to that: we need to set things
18       up correctly, and do things right. Therefore, please ask your partner to be
         more patient. . . .
19

20        47.    On August 15, 2010, YANG responded, "Yes, understood! Please be

21   careful as well in email. See you soon!" On August 19, 2010, YANG wrote an email

22   asking the CS whether he had heard from the CS's contact, and explaining, "It is not

23   about my patience. It is about the end user decides to use something else if they are

24   unable to obtain it." On August 22, 2010, YANG again wrote to the CS, stating that his

25   buyers were going to "cancel the project" if they did not receive purchase details in the

26   next few days. In the email, YANG explained, "It is not me but the [sic] I simply cannot

27   convince the chinese side that you could obtain them."

28
_____

     [8] YANG left the blanks for the CS to fill-in the prices for the particular parts.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

48.     On August 23, 2010, the CS responded to YANG via email, stating that the CS was confident that the CS's contact would obtain the parts.  In response, YANG wrote: "I have forwarded your email to my partner and hope him [sic] understand."

**K.      The August 25th Meeting Between YANG and the CS.**

49.     On August 25, 2010, YANG and the CS met at a restaurant in Seattle.  The meeting was consensually recorded by the CS.   YANG asked whether the CS had spoken with his contact.  The CS stated that his contact wanted to "start slowly" with a small order, to minimize the chance of unwanted attention.  The CS specifically stated, "The thing is, you know, what we're doing is illegal, for all intents and purposes.  So, we have to be really careful."  YANG acknowledged this by stating, "Yeah."  The CS further explained that his contact wanted to do a "trial order" for five of the Xilinx parts.  YANG asked, "How soon can he get it?"

50.     The CS told YANG that his contact wanted to meet with YANG in person. YANG asked whether the contact was "trustworthy."  The CS stated that he was, and that the CS had done "a couple of deals" with the contact in the past.  YANG asked, "Legal or illegal?" referring to the nature of the prior deals.  The CS stammered and laughed, and then YANG replied, "Grey."  YANG said he was asking because he had "to trust the guy."  The CS acknowledged that there was "a big risk involved" in their dealings, but stated that "the money is worth it."

51.     Throughout the conversation, YANG reiterated that his Chinese partners would be responsible for shipping the Xilinx products overseas.  YANG discussed various alternative scenarios for how the products would be shipped overseas, and assured the CS that his associates "have a way to get it out."  In addition, YANG confirmed that the money used to purchase the parts would be coming from China. YANG also requested that the CS use his contact to obtain the other parts he originally requested, in addition to the Xilinx Subject Parts.

//

//

*United States v. Lian Yang*
COMPLAINT - Page 15

**L.      The September 14th Meeting Between YANG, the CS, and the Undercover Agents.**

52.      On September 14, 2010, YANG met at a Seattle restaurant with the CS and two undercover FBI agents ("UC-1" and "UC-2"), who were posing as the CS's industry contacts.  The conversation was recorded by the undercover agents.  At the outset of the meeting, UC-2 advised YANG, "I'm not sure how much experience you have in this, but, you know, there's a lot of ah, compliance."  YANG replied, "I know it's hard," and then explained, "Yeah, at first I tried to (unintelligible) then I started to understand how, how restrictive it is. . . .  They ask what the product, who you're selling to and then, we gave actually some of the, the real end user but they just said 'no.'"

53.      During the meeting, UC-2 provided YANG with a list of parts produced by Xilinx, and asked YANG to identify which specific product he wanted.  YANG indicated that he wanted the radiation tolerant version of a particular Xilinx microchip (the Subject Part).  The UCs explained to YANG that Xilinx manufactures both a radiation hardened version of the microchip (an export controlled product) and an alternative commercial grade version of the product (which is not export controlled).  The UCs stated that in many cases the commercial grade version satisfies the needs of the customer, and offered, "If there's any way that we can [acquire the commercial grade version] everybody is totally safe and there's no issue."  The UCs further explained that the radiation hardened version of the part was "a restricted item" and "there's issues there."  YANG specifically rejected the commercial grade version, and requested that the UCs acquire the export controlled version of the product.  YANG said that his partners were "very firm" that they wanted the radiation hardened version of the Xilinx product, and that "they want it very badly."

54.      The UCs specifically advised YANG that it was not legal to export the Xilinx product to China.  For example, UC-1 stated, "There's no negotiation in there. The rule is absolutely (unintelligible) and clear.  You are – we're in deep trouble if, you know, (unintelligible). . . .  Any of those go bad and we're all, we're all sitting in the same cell together.  You know what I'm saying?"  YANG replied, "Oh. . . .  Yeah, I

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  understand."

2      55.    In response to questions from the UCs, YANG confirmed that the parts

3  would be shipped to China after they are acquired.  YANG claimed not to know the

4  details of how his partners intended to export the products, stating, "I'm just supposed to

5  give to somebody.  But of course, if you want, I can ask them . . ."  YANG later

6  explained, "And they, they may not want me to share all the details but um, I, for you, I, I

7  can press them to tell me how [they intend to export the products]."  YANG also assured

8  the UCs that his partners were "very professional" and had done this same thing in the

9  past.

10     56.    The UCs and the CS expressed concern over the fact that if YANG and his

11 partners were caught attempting to export the parts, they would all be in trouble with the

12 law.  UC-1 said, "The difference is that, they'll [the partners in China] lose money."  The

13 CS then stated, "We're going to jail."  YANG replied, "Yeah.  That, that's like, that's

14 exactly why my first question is safety.  How, how to do that [the export]."  UC-1 added,

15 "I think you understand my concern.  I think you . . ."  And YANG answered, "I totally

16 understand. . . .  For me it's same, it's the same thing."  UC-1 then stated, "I don't think

17 that I'm the only one going down on this ship. . . ."  UC-2 asked, "What happens if

18 something goes wrong, if they get caught, how do they handle it?  Are they gonna

19 quickly, are they gonna give us up or what? . . .  I don't know what they have in place for

20 something like that."  YANG replied, "Yeah, that's . . . 'cause they don't know you, they

21 don't know you. . . .  The problem is the product."  UC-2 responded, "Exactly, that . . .

22 comes back to us."  YANG answered, "I don't know.  I don't know."  Later in the

23 conversation, YANG stated, "[O]f course, the worst case scenario is if we got caught.

24 That's the worst.  Other than that, if it [the parts] gets lost . . . nothing to do with you

25 guys."

26     57.    YANG advised the UCs that his client in China wanted 300 of the Subject

27 Parts, but that the initial order would be for 30 parts.  YANG then suggested that a false

28 purchase order could be created listing parts for purchase that were not export controlled

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  (instead of the Subject Parts). The UCs clarified this concept by asking, "[S]o you're
2  saying, what you're suggesting is, when you send the money to us, we create bogus
3  invoices for the same amount of money? . . . For the non-restricted items?" YANG
4  replied, "Right." UC-1 later said, "The problem is, is look at the package, serial
5  numbers." In response, YANG asked, "Is there a way for you to erase that serial
6  number?" UC-1 answered, "I don't think we touch products." Based on my training and
7  experience, I believe that YANG was contemplating the possibility of obliterating or
8  *otherwise removing the serial numbers on the Subject Parts, to conceal the illegal*
9  transaction from law enforcement detection. In addition, I believe that YANG suggested
10  the creation of a false purchase order for the purpose of concealing the illegal nature of
11  the transaction.

12      58.     YANG explained to the UCs that he previously had worked with another
13  individual to obtain the Subject Parts. According to YANG, that individual told him it
14  was legal to "ship it out." UC-2 clarified with YANG that it was *not* legal to export the
15  Subject Parts by stating, "It's legal? . . . He didn't have a clue what the hell he was
16  talking about. . . . You understand that?" UC-1 added, "He's either a liar or an idiot."
17  YANG acknowledged this.

18      59.     The UCs explained to YANG that in order to conceal the fact that the parts
19  would be destined for China, a domestic United States company would be falsely listed
20  on the end user certificate that is submitted to the manufacturer. The UCs explained that
21  the false end user would need to be paid for "taking this risk," which would increase the
22  total purchase price. YANG indicated that he understood this arrangement and the added
23  cost. The UCs also explained that, "given the risks" involved with the transaction, if any
24  of the parts were defective it would not be easy to return the parts. YANG stated that he
25  understood this and had advised his partners of the same. For example, YANG stated, "I
26  know there's no taking back." UC-2 reiterated the illegal nature of the transaction: "But
27  if something goes wrong, we all potentially end up in jail, okay? And so that's what, as
28  long as they understand that."

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    60.    YANG indicated that he would arrange for money to be wired from Hong

2  Kong to pay for the Subject Parts. UC-1 told YANG that he was going to open a bank

3  account to use for this transaction, and that a friend of his in the banking industry would

4  monitor the account and protect it from being flagged for suspicious activity. YANG

5  indicated that he understood this arrangement.

6  **M.    Email Correspondence Between YANG and the UCs.**

7    61.    On September 20, 2010, UC-2 sent an email advising YANG that an order

8  had been placed for 30 of the Subject Parts. UC-2 explained that he would arrange to

9  open the new bank account and would forward the account information to YANG shortly.

10    62.    On September 20, 2010, YANG responded to UC-2's message, confirming

11  the delivery date for the parts. YANG also stated, "As far as the shipment detail is

12  concerned, I'd like to go to SF [San Francisco] sometime soon to meet again. We can

13  also talk about payment logistics at this time." On September 21, 2010, UC-2 responded

14  and proposed a meeting date. YANG replied, "Super!" YANG then wrote a second

15  message to UC-2, asking whether he "need [sic] the fund to be ready" for the order.

16  YANG stated, "The bottom line is that I don't want the schedule of the meeting [to] delay

17  the obtaining of the items."

18  **N.    The October 1st Meeting Between YANG and the UCs.**

19    63.    On October 1, 2010, YANG met with UC-1 and UC-2 at a restaurant in San

20  Francisco, California. The undercover agents recorded this conversation. The UCs

21  advised YANG that their buyer would purchase the Subject Parts from Xilinx as part of a

22  larger order that would include other unrelated non-export controlled parts. As explained

23  by the UCs, including the Subject Parts in the larger order would serve to draw less

24  attention to the order for the Subject Parts.

25    64.    YANG reiterated that his buyer wanted 300 of the Subject Parts. YANG

26  explained that he wanted to purchase five parts initially, and then if the deal went through

27  successfully, he would purchase the remaining Subject Parts. YANG promised to wire

28  money in advance of delivery of the five parts, and agreed to pay $16,000 per unit. The

*United States v. Lian Yang*
COMPLAINT - Page 19

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   UCs explained that the price reflected the fact that their buyer was taking a risk in having

2   its name on the paperwork in the event the true circumstances of the order were ever

3   detected. UC-1 provided YANG with a sheet of paper with bank account information.

4   YANG stated that he would wire $80,000 into the bank account the following Monday.

5   YANG also stated that he would create a purchase order "for the same amount of

6   money," referring to his previously articulated plan of fabricating a purchase order for

7   non-export controlled parts.

8       65.    The UCs asked YANG about how the products would be shipped out of the

9   United States. YANG explained that he would receive the parts from the UCs and then

10  deliver them to someone else who, in turn, would take care of shipping the parts out of

11  the country. YANG also stated that the parts would be tested for defects prior to shipping

12  them out of the United States. Specifically, YANG explained: "The product will stay

13  here in the States until it is safe, absolutely safe, to ship to China for the company. So,

14  they didn't deal with Xilinx at first before, so that is why they have to look at it [test the

15  product] here. . . . Look at the quality and everything and then they will see how to

16  repackage it and erase the serial number and make some other (unintelligible). They are a

17  better expert on this, they will know that. . . . And won't ship out of the country until it's

18  absolutely safe." UC-2 later clarified, "[T]hen the idea is to repackage it and ship it over

19  as something else?" YANG replied, "Right . . . They do that like, um, there's tons and

20  tons of stuff going to China."

21      66.    YANG also provided the UCs with a written list of additional parts that he

22  wanted to acquire, including the previously referenced parts manufactured by DDC and

23  Peregrine. YANG emphasized to the UCs that his partners wanted all of the parts on the

24  list.

25      67.    Later that afternoon, YANG spoke with UC-2 over the telephone. YANG

26  stated that he had left two messages for his "buyer" but had not yet heard back. YANG

27  further stated that he would accept delivery of the Subject Parts from the UCs in Seattle.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**O.    YANG Provides the UCs With a Proposed Contract.**

68.    On October 2, 2010, YANG sent two emails to UC-2 explaining that he had spoken to "the buyer" and "they agreed to pay [$100K] up front and stick with the original price." However, on October 3, 2010, YANG sent UC-2 an email stating, "After talking to my partner, I have modified the agreement (based on our verbal agreement of the meeting in San Francisco) a little in a contractual format."

69.    The following day, October 4, 2010, YANG emailed a proposed contract to the undercover agent. The contract reflected that a company named "MyIntelliSrc"[9] would purchase "300 _____ from [the undercover company]."[9] The contract set forth a unit price of $14,000, and provided that MyIntelliSrc would purchase 300 parts spread over eleven transactions, with the first deal being for five parts. The contract further provided that MyIntelliSrc would pay $50,000 in advance of delivery of the first five parts; that MyIntelliSrc would pay an additional $20,000 upon delivery; and that MyIntelliSrc would pay an additional $620,000 in connection with the remaining parts. The contract identified YANG as the "International President" of MyIntelliSrc. The contract further provided that it would be terminated automatically "if one side breaches the agreement. The most serious breach would be the delay of delivery." Via a separate email sent on October 4, 2010, YANG assured the undercover agent that the proposed contract had been "approved by the buyer."

70.    On October 4, 2010, UC-2 responded with concerns about the pricing scheme outlined in YANG's proposed contract. Among other things, the undercover agent wrote: "[T]his is not a business-as-usual transaction. There are risks involved, so we have to handle things a little differently, which means we need more of the costs covered up front." YANG responded later that day, stating, "I will get back to my buyer.

---

[9]    According to records on file with the Washington Secretary of State, MyIntelliSrc International Corp. is an active corporation registered in Washington State. YANG is listed as the registered agent and president of MyIntelliSrc International Corp. The listed business address for the company is YANG's residential address in Woodinville, Washington.

[9]    YANG left a blank on the contract, rather than identify the Xilinx Subject Parts.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  As I mentioned, the principle is that for the 30, we do something that we both feel safe."

2        71.    On October 5, 2010, through a series of emails, YANG offered to

3  compromise with UC-2 on the pricing, and he sent a revised contact.  In an email

4  describing the new payment arrangement, YANG stated, "I think this contract basically

5  carries no risks for you (financially) but we have to still take considerably high risk

6  throughout the deal. . . ."  Based on my training and experience, and on the prior

7  discussions between YANG and the UCs, I believe that YANG's use of the parenthetical

8  "(financially)" indicates that he is aware the transaction he is negotiating with the

9  undercover agents is illegal – he appears to be distinguishing between the concepts of

10  financial risk and the risk of being caught by law enforcement.

11  **P.**    **The October 5th Phone Call Between YANG and the UC-2.**

12        72.    On October 5, 2010, UC-2 placed a recorded phone call to YANG.  YANG

13  expressed concerns about the financial risks associated with the planned purchase of the

14  300 Xilinx parts.  In response, UC-2 emphasized that, in addition to the financial risks,

15  there were legal risks as well:

16      [Y]ou know, it's not just the financial risk that we are talking about, okay?
I mean, I think we both understand.  I mean, what we are trying to do here

17      is illegal, and whether or not we agree as to why it is illegal, that is besides
the point.  What we are trying to do here is more than just the financial risk.

18      That's why we're so concerned about how you're going to ship this out of
the country, because, you know, if anyone gets caught, we can have our

19      $10,000 in our pocket and be happy, but if you get caught, none of that
matters because we all could potentially go to jail for this.  So, you know,

20      that's the risk we are talking about, and that's the risk that [we] both face,
we share that together, so it's not just the financial risk.  I want to be clear

21      about that. . .

22  YANG replied, "Sure, yeah.  Me too.  Like I said, yeah, we are basically, we trust, it all

23  boils down to trust. . . .  So, I mean . . .  If I don't trust you, you know, I wouldn't do this.

24  If you don't trust me, there is really no, you can't hide this and that. . ."

25        73.    YANG reaffirmed that he wanted to proceed with the deal, and he further

26  negotiated over the pricing structure.  YANG agreed to wire $60,000 to the UCs within

27  two days.  YANG further agreed to pay an additional $20,000 cash upon delivery of the

28  first five parts.  YANG and UC-2 agreed on a delivery date of November 9, 2010.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

74.    YANG again explained that, after he received the Subject Parts, he would deliver the parts to someone else who would be responsible for testing and shipping the parts out of the country.  YANG still claimed not to know the details of how the parts would be exported.  YANG also stated, "And they'll let us know whether or not it's easy to actually totally erase the serial number . . . Extremely safe, they're likely not going to be totally recognizable after they handle it."  YANG later confirmed, "I made a request to change the serial number."

75.    On October 5, 2010, shortly after the above referenced conversation, UC-2 modified the written contract to reflect the terms reached over the phone, and emailed YANG a copy of the revised contract.

**Q.    YANG Arranges for a Wire Transfer Payment for the Subject Parts.**

76.    On October 6, 2010, UC-2 received a voice mail message from YANG, who asked that the order be placed as soon as possible.  That same day, YANG sent UC-2 an email stating, "Wire sent. . . . Please order ASAP."  UC-2 replied, "I will . . . make sure the order is placed with Xilinx ASAP."  In response, YANG wrote, "I don't want Xilinx, I want Kopin Display.  Will send you a PO [purchase order].  It's a typo :)"  UC-2 responded to YANG's email: "Understood."  Based on my training and experience, and on the prior conversations between YANG and the UCs, I believe that YANG's reference to the Kopin Display followed by, "It's a typo :)" was related to Yang's previously discussed plan to fabricate a purchase order listing a non-export controlled part (*i.e.*, the Kopin Display), in an effort to conceal that he was, in fact, attempting to purchase ITAR export controlled parts (*i.e.*, the Xilinx parts).

77.    On October 7, 2010, YANG and UC-2 exchanged emails confirming that the order had been placed.  Later that day, YANG wrote to UC-2, "Fund went through.  Should see it today.  Should be safe to confirm the 5 units."

78.    Bank records confirm that on October 7, 2010, an incoming wire transfer in the amount of $60,000 was credited to the undercover bank account.  According to bank records, the wire transfer was received from a J.P. Morgan Chase account held in the name

*United States v. Lian Yang*
COMPLAINT - Page 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    of "Ardent Solar, LLC."[10]  The words "solar equipment components" were listed under the

2    payment details section on the wire transfer paperwork.

3    **R.      YANG's Recent Communications with the Undercover Agents.**

4           79.      Based on my review of travel records, I am aware that YANG traveled from

5    Seattle to the People's Republic of China on October 15, 2010.  YANG returned to Seattle

6    on November 2, 2010.  YANG did not communicate with either the CS or the UCs while he

7    was in China.[11]

8           80.      On November 2, 2010, YANG sent UC-2 an email seeking to confirm the

9    delivery date of November 9, 2010.  YANG's email also stated that he "was told" that each

10   Xilinx unit has a "companion [CD] and certificate," and he asked UC-2 to confirm this.

11   UC-2 wrote back stating that everything was still on schedule, that the parts would come

12   with a "certificate of conformance and the testing results," and that he would have to check

13   on the "companion CD."

14          81.      On November 3, 2010, UC-2 placed a recorded telephone call to YANG.

15   UC-2 confirmed that he would deliver the five Xilinx parts to YANG in Seattle on

16   November 9, 2010.  UC-2 also expressed concern that the wire transfer documents

17   described the parts as "solar components," which was inconsistent with YANG's

18   previously stated plan to create a bogus purchase order listing the parts as Kopin Display

19   modules.  UC-2 stated, "[W]e want to make sure that it, you know, that it all marries up,

20   right?  Because we don't want to have, we don't want to give you Xilinx parts and then

21   have a purchase order for Kopin and then the wire transfer says, you know, 'solar

22   components.'  So let's make sure we get all, all that straight, okay?"  YANG acknowledged

23   _____

24   [10]   According to records on file with the Washington Secretary of State, Ardent
Solar, LLC is an active business registered in Washington State.  Allen Chongtai Huang

25   is listed as the registered agent of Ardent Solar, LLC.  The listed business address for the
company is Huang's residential address in Redmond, Washington.  On September 16, 2010,

26   FBI agents observed YANG and Huang meeting together for approximately one hour at a
restaurant in Redmond, Washington.

27   [11]  On October 25, 2010, UC-2 left a voicemail for YANG advising him that the
transaction was still on schedule for the planned November 9, 2010, delivery date.  UC-2

28   also asked YANG to return his call.  On October 29, 2010, UC-2 left another voicemail
for YANG, asking for a return call.  YANG did not return either call.

*United States v. Lian Yang*
COMPLAINT - Page 24

1   that all of the paperwork needed to be consistent. In response to further questioning by

2   UC-2, YANG stated that he still did not know the details of how the parts would be shipped

3   to China. YANG also added, "I don't want to talk about this on the phone. So, if you want

4   to talk again, we can meet . . . again but, uh, I, yeah. . . . I don't want to talk about this at

5   all."

6        82.     On November 5, 2010, UC-2 sent YANG an email explaining that the

7   delivery date would be delayed for two or three weeks, pending a review of the transaction

8   by the "government." The email further stated, "*Xilinx has not yet received the approval*

9   *from the State Department.*" YANG replied to the email: "hmm, that sucks. but I guess

10   this is life. I will be patiently waiting."

11        83.     Later on November 5, 2010, UC-2 placed a recorded telephone call to YANG

12   to further discuss the reasons for the delay. UC-2 explained that, "[T]he delay is with the

13   government. The compliance paperwork is just, is waiting to be reviewed and signed."

14   UC-2 further stated that the paperwork that had been submitted (including the documents

15   listing a false domestic end user) was still in the process of being reviewed and approved

16   by the government. UC-2 explained that, "[T]he manufacturer does their due diligence and

17   tries to figure out, 'Okay, is this company legit? Is this for domestic use?' You know,

18   whatever. . . . So, I'm not concerned about it being denied at the government level. . . .

19   We do the due diligence ahead of time to make sure it doesn't get to that point." YANG

20   asked, "[S]o, basically every work order goes through the same process, right?" UC-2

21   assured YANG that the parts would arrive, and that it was "not a question of if, it's just a

22   matter of when."

23        84.     On November 15, 2010, YANG sent UC-2 an email stating that his "partner"

24   was "getting anxious about the 5 units. Any new news and progress?" UC-2 replied:

25         As I said before, it's not a question of if, but when. The hard part is getting
26         the manufacturer to agree to sell, which we've already done. This is exactly
          why we're using our guy. I appreciate your patience. Please convey my
27         apologies to your partner. And as I mentioned before, the good news is that
          our supplier put in a request for 30 parts. That means once you're ready for
28         the next order, things will move much more quickly.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   YANG replied to UC-2's email by writing, "I will definitely convey to them. I am crossing

2   my fingers for faster delivery service since this is our first time. After this, things will be

3   much smoother I believe!"

4          85.    On November 21, 2010, YANG wrote to UC-2: "With the time passing, it is

5   hard not to be concerned. Please try to give me an arrival time (latest) so that my partner

6   can plan."

7          86.    On November 30, 2010, UC-2 placed a recorded telephone call to YANG.

8   UC-2 confirmed that he had received the five Xilinx Subject Parts, and they agreed to meet

9   in Seattle on the afternoon of December 3, 2010, for the delivery. YANG stated that he

10  would bring the $20,000 cash that was owed for the parts upon delivery.

11         87.    Later on November 30, 2010, YANG sent UC-2 an email with an attached

12  purchase order document. Consistent with YANG's previously stated plan to list the

13  product being purchased as a non-export controlled item, the purchase order falsely reflects

14  that a Kopin "commercial" grade part was being purchased. The purchase order further

15  indicates that it was prepared and approved by YANG.

16  **S.    ITAR Determination by the U.S. Department of State.**

17         88.    I submitted the specifications for the Xilinx Subject Parts to the United

18  States Department of State, Directorate of Defense Trade Controls ("DDTC"). The DDTC

19  is responsible for the administration of Section 38 of the Arms Export Control Act, Title

20  22, United States Code, Section 2778, and the International Traffic in Arms Regulations

21  (ITAR).[12] On November 8, 2010, the DDTC issued a Pre-Trial Certification Memorandum

22  confirming that the Subject Part is defined by the ITAR as a defense article covered by

23  Category XV(e) on the U.S. Munitions List. Accordingly, the Xilinx part is controlled

24

25         [12] The Arms Export Control Act generally prohibits the export of defense articles
    and services that are designated by the President of the United States. *See* 22 U.S.C.
26  § 2778(b)(2). The Act provides for criminal penalties for willful violations of the Act.
    *See* 22 U.S.C. § 2278(c). The Department of State, exercising for the President the above
27  authority under the Act, has promulgated the International Traffic in Arms Regulations
    ("ITAR"), 22 C.F.R. § 120.1 *et seq.* These regulations include the U.S. Munitions List,
28  which consists of categories of defense articles and services that cannot be exported
    without a license issued by the Department of State DDTC. *See* 22 C.F.R. §§ 121.1,
    123.1, 127.1.

1  under the ITAR, and it is illegal to export the part from the United States without a license

2  issued by the State Department authorizing such export.  The DDTC Pre-Trial Certification

3  Memorandum confirms that YANG has never applied for, nor received, any license to

4  export any items from the United States.

5         89.    I also submitted to DDTC the specifications for the above referenced parts

6  manufactured by DDC and Peregrine.  DDTC has provided a preliminary "Level 1

7  Determination" that both parts are ITAR controlled.  I have requested a final, Pre-Trial

8  Certification with respect to these parts, and that request is still pending.

9  ### III. <u>CONCLUSION</u>

10         90.    Based on the foregoing, I believe there is probable cause to believe that LIAN

11  YANG conspired to violate the Arms Export Control Act, in violation of Title 18, United

12  States Code, Section 371, Title 22, United States Code, Section 2778, and Title 22, Code of

13  Federal Regulations, Section 127.1.

14  

15  

16  JOSEPH HOOPER, Special Agent
    Federal Bureau of Investigation

17  

18      Based on the Complaint and Affidavit sworn to before me, and subscribed in my

19  presence, the Court hereby finds that there is probable cause to believe the defendant

20  committed the offense set forth in the Complaint.

21      Dated this 2nd day of December, 2010.

22  

23  

24  ROBERT S. LASNIK
    Chief United States District Judge

25  

26  

27  

28  

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970